ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| **CRISTINA DOMÍNGUEZ, MARÍA ARAYA & ANA RUBIERA**<br><br>Apeladas<br><br>v.<br><br>**TRADITION FRANCAISE, INC. & FERNANDO PÉREZ como Presidente y en su carácter personal**<br><br>Apelantes | KLAN202400277 | **APELACIÓN** procedente del Tribunal de Primera Instancia, Sala Superior de **San Juan**<br><br>Civil Núm.: **SJ2019CV10058**<br><br>Sobre: Discrimen, Despido Constructivo, Hostigamiento Sexual, Acoso Laboral, Represalias y Daños |

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Pagán Ocasio, el Juez Marrero Guerrero y la Jueza Boria Vizcarrondo.

Boria Vizcarrondo, Jueza Ponente.

**SENTENCIA**

En San Juan, Puerto Rico, a 11 de septiembre de 2024.

Comparecen ante nos, mediante recurso de *Apelación,* Tradition Francaise, Inc. (Tradition) y Fernando Pérez (Sr. Pérez) como Presidente de Tradition y en su carácter personal (en conjunto, Demandados o Apelantes) y nos solicitan que revisemos la *Sentencia* emitida el 16 de febrero de 2024 por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI).[1] Mediante esta *Sentencia,* el TPI declaró Ha Lugar a la *Demanda* instada por Cristina Domínguez (Sra. Domínguez), María Araya (Sra. Araya) y Ana Rubiera (Sra. Rubiera) (en conjunto, Demandantes o Apeladas) y le ordenó a la parte demandada a pagarle un total de

---

[1] Apéndice de *Apelación,* págs. 679-710. Notificada y archivada en autos el 20 de febrero de 2024.

$1,314,157.11 en daños y $85,153.80 en honorarios de abogados, en conjunto a las Demandantes.

Por los fundamentos que discutiremos a continuación, modificamos la *Sentencia* recurrida y devolvemos el caso al foro primario para que se realicen los procedimientos aquí ordenados.

**I.**

El caso de autos originó el 23 de septiembre de 2019, luego de que las Demandantes presentaran una *Demanda* en contra de los Demandados al amparo de la Constitución de Puerto Rico, la Ley Antidiscrimen de Puerto Rico, Ley Núm. 100 de 30 de junio de 1959, según enmendada, 29 LPRA sec. 146 *et seq.* (Ley Núm. 100), la Ley para Garantizar la Igualdad de Derecho al Empleo, Ley Núm. 69 de 6 de julio de 1985, 29 LPRA sec. 1321 *et seq.* (Ley Núm. 69), la Ley de Despido Injustificado, Ley Núm. 80 de 30 de mayo de 1976, según enmendada, 29 LPRA sec. 185 *et seq.* (Ley Núm. 80), Ley Contra el Despido Injusto o Represalias a Todo Empleado por Ofrecer Testimonio Ante un Foro Legislativo, Administrativo o Judicial, Ley Núm. 115-1991, según enmendada, 29 LPRA sec. 194 *et seq.* (Ley Núm. 115), la Ley del Bono de Navidad para Trabajadores y Empleados de la Empresa Privada, Ley Núm. 148 de 30 de junio de 1969, según enmendada, 29 LPRA sec. 509 *et seq.* (Ley Núm. 148), y el Artículo 1802 del Código Civil de 1930[2], según enmendado, 31 LPRA sec. 5141 (Código Civil).[3] En la *Demanda*, las Demandantes alegaron discrimen por razón de edad, sexo y origen nacional, acoso laboral, represalias, despido injustificado en su modalidad de despido constructivo y daños. En el caso de la Sra. Rubiera, esta alegó además hostigamiento sexual.

---

[2] Aunque el Código Civil de 1930 quedó derogado tras la aprobación de la Ley Núm. 55-2020, se hará referencia al Código del 1930 puesto que este fue el vigente al momento de los hechos particulares de este caso.
[3] Apéndice, *supra*, págs. 1-31.

Las Demandantes fueron empleadas del Sr. Pérez mientras laboraban como meseras en el Restaurante Tradition Francaise, también conocido como La Boulangerie, localizado en San Juan, Puerto Rico. La Sra. Domínguez fue empleada desde el 15 de agosto de 2015 hasta el 20 de septiembre de 2019. Por su parte, la Sra. Araya fue empleada desde el 31 de mayo de 2002 hasta el 20 de septiembre de 2019. Finalmente, la Sra. Rubiera fue empleada desde el 26 de noviembre de 2014 hasta el 26 de octubre de 2018. En las tres instancias, las empleadas renunciaron de sus puestos.

Según estipulado por las partes, las funciones de las Demandantes como meseras consistían en servicio al cliente, limpiar las mesas, rellenar las neveras, limpiar la cafetera, guardar mercancía y limpiar (barrer y mapear) el salón.[4]

### A. La señora Cristina Domínguez

Con relación a la Sra. Domínguez, el TPI estimó probado los siguientes hechos:

1. La Sra. Domínguez es residente de San Juan, Puerto Rico pero nació en la República Dominicana. Al momento de emitirse la *Sentencia*, tenía 59 años.[5]

2. La Sra. Domínguez devengaba un salario de $3.70 por hora más un pago adicional por concepto de propinas.[6]

3. La Sra. Domínguez llegó a devengar $500.00 bisemanales por concepto de propinas y los sábados y domingos llegó a devengar $150.00 en propinas diariamente.[7]

4. Desde que la Sra. Domínguez comenzó a trabajar en La Boulangerie, siempre trabajó los mismos días (domingo, martes, miércoles, jueves y sábado) y tuvo el mismo horario (6:30 am - 3:00 pm) y una vez comenzaron los cambios en los días de trabajo y

---

[4] *Íd.*, pág. 683.
[5] *Íd.*, pág. 684.
[6] *Íd.*
[7] *Íd.*

reducción de horas, estos tuvieron el efecto de reducir el salario de la Sra. Domínguez.[8]

5. Entre el 14 de agosto de 2015 y el 27 de agosto del 2015, la Sra. Domínguez trabajó un total de 84.95 horas bisemanales, por el cual generó un sueldo de $967.41, de los cuales $653.09 correspondían a propinas.[9]

6. Entre el 23 de agosto de 2019 y el 5 de septiembre de 2019, la Sra. Domínguez trabajó un promedio de 57.75 horas bisemanales, por el cual generó un sueldo de $464.09, de los cuales $250.41 correspondían a propinas.[10]

7. El TPI concluyó que en efecto, existía una diferencia salarial entre el periodo trabajado en el 2015 y el 2019.[11]

8. El ambiente laboral en el que la Sra. Domínguez trabajó era hostil y que ese ambiente hostil fue provocado por el Sr. Pérez.[12]

9. La Sra. Domínguez sufrió agresiones verbales por parte del Sr. Pérez, en adición a otros actos cometidos como empujones, gritos, insultos, amenazas y la utilización de lenguaje inapropiado y denigrante al dirigirse a la Sra. Domínguez.[13]

Durante la vista celebrada el 18 de octubre de 2022, la Sra. Domínguez relató varios incidentes instigados por el Sr. Pérez. Testificó:

> P. ¿Cómo era el ambiente de trabajo en La Boulangerie?
> R. Era muy tenso, muy hostil… muy desagradable, la verdad.
> P. ¿A qué usted se refiere con "tenso, hostil, desagradable"?
> R. Este… el señor Fernando Pérez nos gritaba, molestaba, nos llamaba mucho la atención, se burlaba.[14]
> […]
> P. Yo quiero que usted explique detalladamente todos los incidentes de agresiones verbales y físicas que

---

[8] *Íd.*
[9] *Íd.*
[10] *Íd.*
[11] *Íd.*, pág. 685.
[12] *Íd.*
[13] *Íd.*
[14] Transcripción de la vista celebrada el 18 de octubre de 2022, pág. 72.

usted, eh, vivió con el señor Fernando Pérez. Vamos a ir una por una... o sea, ¿qué incidentes ocurrieron?

R. En el 2017, yo estaba con una compañera mía, con Ana [Rubiera], en el área de la cafetería, esa área es bien diminuta, bien... poco espacio, estábamos las dos temprano.

[...]

R. Y el señor Fernando Pérez entró sin aviso en el centro de nosotras. Yo le llamo y le digo, eh: "Permiso, señor, se pide permiso para entrar".

[...]

R. El señor Fernando Pérez abrió la válvula de vapor y me la empujó hacia mí, el calor hacia mí, a mano.

[...]

R. Después de eso, en enero, el señor Fernando Pérez dijo que iban a cambiar las camisas del uniforme. Entonces le dijimos que ya todos teníamos unas camisas hace tiempo[...]. El día que me tocó [...] entregar las camisas, nos tocó ir en dos en dos. A mí me tocó subir con Ana [Rubiera].

[...]

R. Cuando subí allá, el señor Fernando Pérez nos entregó las camisas y empezó a decirle: Ponte las camisas aquí. Ven, ven, ven, quítate la camisa, póntela. Nosotras nos dirigimos hasta el baño y él insistió: Quítese la camisa, póntela aquí. Yo le dije: Por favor, señor, cálmese, ¿qué le pasa a usted? Y él me dijo: ¿Qué te pasa a ti? ¿A ti qué se te va a ver a ti, vieja? A ti no se te va a ver nada.[15]

En otra ocasión, el Sr. Pérez multó a la Sra. Domínguez por un sándwich devuelto a la cocina pese que ella no había tomado la orden.[16] Además, el Sr. Pérez mostró conducta agresiva, golpeando con una rebanadora el *"counter"* mientras la Sra. Domínguez conversaba con el señor Guy Fuentes (Sr. Fuentes), otro empleado de La Boulangerie. La Sra. Domínguez, testificó sobre las veces en las que el Sr. Pérez la humilló públicamente frente a otros empleados. En una ocasión, el Sr. Pérez le dijo a otro empleado que tuviese cuidado con la Sra. Domínguez, puesto que ella les robaba las mesas a los otros meseros. También testificó sobre otros actos hostiles por parte del Sr. Pérez.

P. ¿Cómo usted se sentía cada vez que pasaban esos gritos, estas humillaciones frente a otras personas?

R. Eh, era muy difícil, me sentía a veces humillada [...] era como que uno no sabía qué hacer, qué decir, uno no sabía si estaba, qué decir, qué hacer, a dónde moverme. Porque en cualquier momento él podía bajar

---

[15] *Íd.*, págs. 74-75.

[16] *Íd.*, pág. 89.

y tenía uno que buscar espacio porque te empujaba, te
tiraba. Era un...
P. ¿Cómo que la empujaba?
R. Que te echaba hacia el lado.
P. Okey. ¿Y qué personas estaban quizás alrededor
que...?
R. Alrededor, pues, podían estar los compañeros, los
compañeros que trabajaban conmigo.[17]

Testificó que el Sr. Pérez trataba a los empleados hombres con respeto y que les hablaba con amabilidad cuando cualquier incidente pasaba, contrario a como les hablaba a las empleadas mujeres.[18] Finalmente, la Sra. Domínguez testificó que el Sr. Pérez tomaba acciones directas contra ella aduciendo que era para hacerle sufrir daños económicos. Sobre esto, testificó que el Sr. Pérez le decía:

R. "Señora, haga esto, te voy a hacer esto para que te
duela el bolsillo".
P. ¿A qué se refiere él con que "para que te duela el
bolsillo"?
R. Pues, él podía quitarme un día de trabajo, me podía
bajar las horas [...]. Eh, si entraba a las 6:00 [am], me
ponía que entrara a las 8:00 [am]. En ese sentido.
P. ¿Qué día le quitaba? ¿Qué día le llegó a quitar?
R. Él me llegó a quitar los jueves.
P. ¿Y qué otro día?
[...]
R. Sábados y domingos.[19]

En síntesis, el TPI estimó probado que el Sr. Pérez creó un ambiente laboral tóxico y hostil para la Sra. Domínguez. Ante este ambiente laboral, el 3 de abril de 2018, la Sra. Domínguez acudió al Departamento del Trabajo. Luego de radicar una querella de discrimen por edad y por sexo, el ambiente laboral se tornó aún más hostil y el Sr. Pérez le comenzó a entregar amonestaciones. En total, recibió cinco (5) amonestaciones, fechadas el 10 de abril de 2019, 14 de abril de 2019, el 21 de abril de 2019, el 12 de mayo de 2019 y el 3 de julio de 2019.[20] Antes de esto, nunca había recibido amonestaciones por parte del Sr. Pérez en todos sus años como

---

[17] *Íd.*, pág. 96.
[18] *Íd.*, págs. 98-99.
[19] *Íd.*, pág. 100.
[20] *Íd.*, págs. 103-110.

empleada en La Boulangerie. Eventualmente, la Sra. Domínguez decidió renunciar a su puesto de trabajo en la Boulangerie, pese que no tuviera donde trabajar ni cómo sufragar sus gastos.[21] Eventualmente, la Sra. Domínguez consiguió trabajo en el Restaurante Café San Telmo en Isla Verde.

A base del testimonio de la Sra. Domínguez, el TPI estimó probado que "[l]os actos cometidos por Pérez en contra de [la Sra.] Domínguez más la reducción de horas y eliminación de los sábados y domingos de su horario, provocaron que la codemandante no encontrara otro remedio que el renunciar a [L]a Boulangerie".[22]

### B. La señora María Araya

Con relación a la Sra. Araya, el TPI estimó los siguientes hechos probados:

1. La Sra. Araya es residente de Carolina, Puerto Rico, pero nació en Chile. Al momento de emitirse la *Sentencia*, tenía 72 años.[23]

2. La Sra. Araya acordó con el Sr. Pérez trabajar como mesera en La Boulangerie los domingos, martes, jueves y sábados.[24]

3. La Sra. Araya devengaba un salario de $3.70 la hora más un sueldo adicional por concepto de propinas.[25]

4. Por concepto de propinas, la Sra. Araya llegó a recibir bisemanalmente las cantidades de $700.00 a $900.00 en propinas. Los sábados y domingos, generaba aproximadamente $150.00 diarios.[26]

5. Entre el 19 de diciembre de 2014 y el 1 de enero del 2015, la Sra. Araya trabajó un total de 91.95 horas bisemanales, por el cual generó un sueldo de $1,274.21, de los cuales $933.99 correspondían a propinas.[27]

---

[21] *Íd.*, págs. 111-112.
[22] Apéndice, *supra*, pág. 686.
[23] *Íd.*, pág. 867.
[24] *Íd.*
[25] *Íd.*
[26] *Íd.*
[27] *Íd.*

6. Entre el 28 de diciembre de 2018 y el 10 de enero de 2019, la Sra. Araya trabajó un promedio de 68.80 horas bisemanales, por el cual generó un sueldo de $918.79, de los cuales $666.08 correspondían a propinas.[28]

7. El TPI concluyó que, en efecto existe una diferencia salarial entre el periodo trabajado en el 2015 y 2019.[29]

8. El ambiente laboral en el que la Sra. Araya trabajó era hostil y que ese ambiente hostil fue provocado por el Sr. Pérez.[30]

9. La Sra. Araya sufrió agresiones físicas y verbales por parte del Sr. Pérez consistentes en gritos, insultos, amenazas y la utilización de lenguaje inapropiado.[31]

El 19 de octubre de 2022, el TPI celebró una vista en la que la Sra. Araya relató varios de los incidentes sufridos los que provocaron la radicación de la *Demanda*. Testificó:

> P. ¿Cuándo comenzaron esos cambios de horario en su trabajo, en La Boulangerie? ¿En qué fecha?
> R. En el 2018.
> [...]
> P. ¿Qué tipo de cambios, verdad, si usted recuerda, que tipo de cambio ocurrió en su horario de trabajo?
> R. Tuve cambios de domingo y sábado, no tuve... tuve cambios de días libres, que eran lunes y miércoles, que yo tenía citas médicas, y eso me afectó.
> P. Okey. ¿Qué pasó con los sábados y domingos, exactamente?
> [...]
> R. Solamente me dio cuatro días de trabajo, solamente de semana, y me sacó sábado y domingo.[32]

La Sra. Araya testificó que ella nunca solicitó la reducción de días de trabajo o que el Sr. Pérez la sacara de los turnos de sábado o domingo. Sobre incidentes o situaciones hostiles, testificó:

> P. Yo quiero que usted me describa, ¿cómo era, verdad, cómo usted describiría al Sr. Pérez?
> R. Bueno, yo te diría intolerante, acosador, maltratante.
> P. ¿Por qué usted lo describe de esa manera?

---

[28] *Íd.*
[29] *Íd.*
[30] *Íd.*, pág. 688.
[31] *Íd.*
[32] Transcripción de la vista celebrada el 19 de octubre de 2022, pág. 25.

R. Últimamente, ya después nos acosaba demasiado [ininteligible]. Y era demasiado, nos humillaba mucho y [ininteligible].[33]

[…]

P. ¿A qué usted se refiere cuando dice que las humillaba?

[…]

R. En muchas ocasiones, el modo de decirnos las cosas, pues, nos humillaba en palabras como que era vieja, que debería tomar el Seguro Social, que ya debería irme, que los oídos míos ya eran viejos y que no escuchaba. Todas esas cosas.[34]

[…]

R. En una ocasión, un cliente me pidió a mí –un domingo– un pan de piquito y no estaba disponible en la panadería, puesto, y fui donde el señor Pérez y le fui a preguntar si había pan de piquito. Y entonces el señor Pérez estaba en la cocina con el celular mostrándole, no sé [qué] a los de la cocina, a los cocineros, no sé qué estaba mostrándole a los... y yo pido permiso. "Señor Pérez, Fernando, ¿hay pan de piquito?", y el señor Pérez se da vuelta y me dice: "Cállate, puñeta", gritando. Yo me quedé asombrada y asustada y me fui.[35]

[…]

R. En una ocasión, yo estaba atendiendo una mesa en el salón que era la mesa once, que me recuerdo, y llegó el señor Pérez gritando en medio del salón, que por qué yo no había hecho las mantequillas. Y yo le pedí disculpas a la mesa, me quedé asombrada, y me quedé... le pedí disculpas a la mesa y me fui a donde Fernando y le dije yo a don Fernando: "Yo no soy la única mesera para hacer mantequillas. No tiene que ir a gritarme al medio del salón".[36]

[…]

R. En otra ocasión, había una reservación de unos clientes, y pidieron que yo los atendiera. Por cierto, las reservaciones no las hacía yo, las hacían las cajeras o la anfitriona. Cuando terminé mi jornada de trabajo, el me llama, y está sentado en el *bar*, en la barra que siempre se sienta en la esquina. Estaba Keyla, su esposa, Juana de la Rosa, y me dijo que quién era yo para hacer una reservación, y yo le iba a contestar que yo no hacía las reservaciones, y él no me dejó contestarle y me dijo: "Vete. Vete. Tu verás lo que te voy a hacer". Y el próximo domingo me quitó... la próxima semana me quitó el domingo de trabajo. Eso fue en el 2018.[37]

Además, la Sra. Araya testificó que, en una ocasión, frente a una cliente, el Sr. Pérez manifestó, refiriéndose a la Sra. Araya, que "Esta señora no la quiero aquí", mientras dio un golpe contra la

---

[33] *Íd.*, pág. 39.
[34] *Íd.*, págs. 40-41.
[35] *Íd.*, pág. 41.
[36] *Íd.*, pág. 42.
[37] *Íd.*, pág. 43.

barra de La Boulangerie.[38] Ante esta conducta, el 3 de abril de 2019, la Sra. Araya acudió al Departamento del Trabajo para radicar una querella de discrimen por razón de edad y sexo. Luego de acudir al Departamento, la situación laboral se tornó aún más hostil.

> P. ¿Cómo el ambiente laboral se tornó luego de que usted radicara las querellas?
> R. Hostil, desagradable. Bien desagradable, bien hostil. Mal.
> P. ¿Qué cosas sucedieron que se tornó hostil, desagradable?
> R. Tenía el… éramos acosados. Nos acosaba mucho, entre las personas que tenía de cajera, y él siempre se molestaba porque si había una cosa que no se hacía así, que eso no se sirve así, que los platos tenían que llevarlos en una bandeja, tú no sabes servirlos, y estaba siempre acosándonos. No nos dejaba trabajar tranquilas. También teníamos problemas con las mesas, que él decía que nosotros no limpiábamos las mesas, y todas esas situaciones las tuvimos con él.[39]

Además de los comentarios públicos del Sr. Pérez, este le comenzó a entregar amonestaciones. Dichas amonestaciones estaban fechadas 13 de abril de 2019, 21 de abril de 2019, 28 de abril de 2019, 12 de mayo de 2019 y 15 de julio de 2019. Ante esta conducta y ambiente hostil creado por el Sr. Pérez, el TPI concluyó que la Sra. Araya no tuvo otro remedio que renunciar a su empleo en La Boulangerie.

### C. La señora Ana Rubiera

Con relación a la Sra. Rubiera, el TPI estimó los siguientes hechos probados:

1. La Sra. Rubiera es residente de Carolina, Puerto Rico pero nació en la República Dominicana. Al momento de emitirse la *Sentencia*, tenía 39 años.[40]

2. La Sra. Rubiera tiene dos (2) hijas y está casada.[41]

---

[38] *Íd.*, pág. 45.
[39] *Íd.*, pág. 47.
[40] Apéndice*, supra*, pág. 689.
[41] *Íd.*

3. La Sra. Rubiera acordó trabajar en La Boulangerie como mesera entre tres (3) y cuatro (4) días a la semana y devengar un salario de $3.70 por hora más las propinas.[42]

4. En varias ocasiones, la Sra. Rubiera recibió avances, invitaciones, mensajes y comentarios de índole sexual por parte del Sr. Pérez.[43]

5. En varias ocasiones, el Sr. Pérez se comportó de manera agresiva en contra de la Sra. Rubiera.[44]

6. En otras ocasiones, el Sr. Pérez realizó comentarios discriminatorios hacia la Sra. Rubiera, relacionados con su origen nacional.[45]

7. Luego de su renuncia, la Sra. Rubiera radicó varias querellas en el Departamento de Trabajo en contra del Sr. Pérez.[46]

8. A base del testimonio de la Sra. Rubiera, el TPI concluyó que la Sra. Rubiera se sentía ansiosa y angustiada por todos los incidentes que sufrió durante su empleo en La Boulangerie. Dichas condiciones laborales dejaron a la Sra. Rubiera sin otro recurso salvo renunciar de su empleo.[47]

El 19 de octubre de 2022 y el 20 de octubre de 2022, la Sra. Rubiera testificó sobre su tiempo como empleada en La Boulangerie. Sobre la conducta de índole sexual por parte del Sr. Pérez, la Sra. Rubiera testificó:

> P. [Y]o quiero que usted le explique, describa todos esos incidentes de hostigamiento sexual que usted, verdad, que se alegó en la [*Demanda*].
> R. Bueno, yo recibía invitaciones tales como ir a Icacos, en el bote, a bañarnos… o sea, que nos fuéramos a bañar desnudos allá. Recibí también invitaciones, por ejemplo, a tomar café en el negocio a las 3:00 de la mañana. De irnos para el Yunque, porque él necesitaba desahogarse y él entendía que conmigo se podía desahogar.[48]
> […]

---

[42] *Íd.*
[43] *Íd.*
[44] *Íd.*, pág. 691.
[45] *Íd.*
[46] *Íd.*
[47] *Íd.*
[48] Transcripción de 19 de octubre de 2022, *supra,* pág. 143.

R. También, en la ocasión que había cambio de uniforme. Él pretendía que yo me cambiara la camisa... esa vez era de dos en dos. Yo fui con la señora Cristina [Domínguez], subí para cambiarnos las camisas, pero como el baño estaba ocupado, [el Sr. Pérez] pretendía que yo me cambiara la camisa frente de él.
[...]
P. ¿Y qué usted le dijo?
R. Que no. Y Cristina, pues, me defendió también.

La Sra. Rubiera testificó que las invitaciones a Icacos y al Yunque se le hicieron verbalmente, en un área del restaurante en donde ella y el Sr. Pérez estaban solos.[49] La invitación a tomar café a las 3:00 de la mañana se le hizo mediante un mensaje de WhatsApp.[50]

R. En una ocasión él envió un video oriental, en el cual habían expresiones de índole sexual, tal como que una bicicleta... Había una persona moviendo el pedal, y cada vez que movía el pedal, en el asiento lo que [estaba] subiendo y bajando era un pene. Había otra parte donde era como que, para lavarse las manos, y lo que había era como que una mujer doblada, y se le notaba los zapatos. El lavamanos era una mujer doblada.
Entonces había otra parte que era una cafetera negra y se notaba como si fueran los senos de la mujer. En una se apretaba y en el otro salía leche.[51]
[...]
P. Okey. Además de las invitaciones, el video que le envió, ¿qué tipo de comentarios le hacía...?
R. Él me decía "*jas mog*" [fonética], el cual yo le explique en una ocasión que mi nombre era Ana.
[...]
R. En una ocasión me vi en la obligación de preguntarle qué quiere decir "*jas mog*" [fonética], porque eso era una palabra francesa, y yo realmente no sé nada de francés. Y él me explicó que "*jas mog*" [fonética] es una montañita de arena, refiriéndose hacia mi parte.
P. ¿Qué parte?
R. Nalgas.[52]

En varias ocasiones, la Sra. Rubiera le dejó saber al Sr. Pérez que no estaba de acuerdo con dichos avances, mensajes y comentarios. Ella los consideraba una falta de respeto y fuera de lugar en un ambiente laboral.[53] La Sra. Rubiera también testificó sobre las multas y descuentos ilegales que le hacía el Sr. Pérez.

---

[49] *Íd.*, pág. 144.
[50] *Íd.*
[51] *Íd.*, pág, 146.
[52] *Íd.*, págs. 148-149.
[53] *Íd.*, pág. 151.

P. Ana, vamos a pasar ahora a otro tema con relación a otros asuntos, sobre lo que es multas y descuentos ilegales. ¿A qué se refiere, cuando ustedes mencionan que él las multaba?

R. Sí. Una vez Cristina Cáceres se encontraba atendiendo a una persona, otra persona... otra compañera mía, una amiga le tomó la orden y yo solo fui a saludar a esa persona, a esa clienta, porque yo también la atendía de vez en cuando. Y la comida salió mal por "equis" o "ye" razón, y cuando veo mi cheque, tenía una multa de $15.00. Al otro día, que era sábado, estoy con mi compañera Cristina, y estábamos comentando que nos dieron la multa de $15.00, y que estaba con el cheque. Y [el Sr. Pérez] llegó de forma burlona: "*Ja, ja, ja, ¿están molestas por la multa que les di?*" y nosotras nos miramos y seguimos caminando molestas, porque nos estas descontando chavos de nuestro cheque, totalmente injusto. Entre otras cosas, se dañaba la cafetera, diecinueve y pico menos del cheque; se dañaba equis refresco, $3.00 en el cheque. O sea, descuento tras descuento. Nosotros no nos dedicábamos a romper ni a dañar las cosas porque era nuestro lugar de trabajo. De ahí nosotros vivíamos. Encima de eso, también teníamos que pagar las camisas [de trabajo].[54]

Con relación a los comentarios denigrantes que el Sr. Pérez hacía sobre la nacionalidad de la Sra. Rubiera, ella testificó que él le dijo directamente "que las mujeres dominicanas solamente servían para trabajar y abrir las patas, aun sabiendo que la madre de sus hijas es dominicana".[55] Además testificó sobre los insultos verbales que recibía por parte del Sr. Pérez. En distintas ocasiones, tanto frente a otros empleados como en privado, el Sr. Pérez la llamó fea[56] y gorda.[57] También le dijo a ella que "se merece una bofetada" frente a otros empleados.[58]

### D. Otros testimonios y *Sentencia*

Además de los testimonios de las Demandantes, el TPI tuvo la oportunidad de oír los testimonios de otros empleados que presenciaron y pudieron confirmar lo que las Demandantes testificaron.

---

[54] *Íd.*, págs. 152-153.
[55] *Íd.*, pág. 156.
[56] *Íd.*, págs. 159-160.
[57] *Íd.*, pág. 160.
[58] *Íd.*, pág. 161.

Luego de celebrar varios días de vistas entre el 18 y 26 de octubre de 2022, aquilatar la prueba testifical y documental y considerar los argumentos de las partes, el 20 de febrero de 2024, el TPI emitió la *Sentencia* ante nuestra consideración. El TPI concluyó que:

> [L]a prueba estableció que durante la relación laboral entre las partes, las demandantes fueron objeto de humillaciones, burlas y agresiones verbales por parte del codemandado Pérez. La prueba apreciada y creída por este Tribunal estableció que el codemandado Pérez utilizó su posición de poder para desacreditar, ofender y avergonzar a las demandantes. Las agresiones verbales se tornaron cotidianas, sometiendo a las demandantes a maniobras hostiles y degradantes. Quedó demostrado que todos los actos cometidos por el codemandado Pérez fueron ataques malintencionados contra la dignidad e integridad de las demandantes, violándoles sus derechos constitucionales.[59]

El TPI además concluyó que las Demandantes lograron establecer casos *prima facie* de discrimen por edad y de discrimen por sexo. En cuanto al testimonio de la parte demandada, el TPI no le mereció ninguna credibilidad. Determinó que el Sr. Pérez "no estableció una explicación razonable para su acción adversa" y que su testimonio "fue uno general sin base o sustancia que sostuviera sus alegaciones responsivas y defensas".[60] Añadió que:

> El Tribunal tuvo ante sí, a las demandantes Domínguez, Araya y Rubiera, las observó mientras declaraban, percibió el dolor, penurias y honradez de éstas y llegamos a la conclusión que la prueba aquilatada y creída por este Tribunal estableció que a las demandantes se les creó un ambiente laboral hostil que les afectó y perjudicó, por lo cual se les debe resarcir los daños morales causados por actuaciones del demandado antes descritas.[61]

Luego de hacer sus determinaciones, el TPI computó la compensación que la parte demandada le debe pagar a las Demandantes. Determinó lo siguiente:

| Concepto | Sra. Domínguez | Sra. Araya | Sra. Rubiera |
|---|---|---|---|

---

[59] Apéndice, *supra*, pág. 703.
[60] *Íd.*, pág. 706.
[61] *Íd.*, pág. 707.

| | | | |
|---|---|---|---|
| Salario dejado de percibir | $79,907.55 | $85,847.55 | $69.860.10 |
| | + | + | + |
| Salario Futuro | $127,478.52 | $68,477.37 | $149,319.30 |
| Subtotal | $207,386.07 | $154,324.92 | $219,179.40 |
| Doble penalidad de la Ley Núm. 100 | x2 | x2 | x2 |
| Subtotal | $414,772.14 | $308,964.84 | $438,358.80 |
| | + | + | + |
| Angustias Mentales ($35,000 x Doble Penalidad de la Ley Núm. 100) | $70,000.00 | $70,000.00 | $70,000.00 |
| Subtotal | $484,772.14 | $378,964.84 | $508,358.80 |
| | - | - | - |
| Mesada por Despido Injustificado | $6,324.05 | $47,020.02 | $4,279.60 |
| Compensación Final | $478,448.09 | $331,629.82 | $504,079.20 |

Inconforme, el 21 de marzo de 2024, el Sr. Pérez presentó la *Apelación* ante nuestra consideración.[62] En dicho escrito, presentó once (11) señalamientos de error.

**1. EL TPI COMETIÓ ERROR CRASO Y MANIFIESTO, INCURRIÓ EN PARCIALIDAD, PASIÓN Y PERJUICIO Y ABUSÓ DE SU DISCRECIÓN AL APRECIAR LA PRUEBA TESTIFICAL Y DOCUMENTAL Y LLEGAR A DETERMINACIONES DE HECHOS INCONSISTENTES CON LA PRUEBA.**

**2. EL TPI COMETIÓ ERROR CRASO Y MANIFIESTO AL CONCLUIR QUE LAS DEMANDANTES-APELADAS ESTUVIERON SUJETAS A DISCRIMEN POR SEXO.**

**3. EL TPI COMETIÓ ERROR CRASO Y MANIFIESTO AL CONCLUIR QUE DOMÍNGUEZ Y ARAYA ESTUVIERON SUJETAS A DISCRIMEN POR EDAD.**

**4. EL TPI COMETIÓ ERROR CRASO Y MANIFIESTO AL CONCLUIR QUE RUBIERA ESTUVO SUJETA A DISCRIMEN POR ORIGEN NACIONAL.**

---

[62] Antes de presentar el recurso apelativo, el codemandado Tradition Francaise, Inc. radicó una quiebra en el Tribunal Federal de Distrito para el Distrito de Puerto Rico. En consecuencia, y cónsono con el Código de Quiebras de Estados Unidos y nuestra *Sentencia* en el caso KLCE202400305, los tribunales de Puerto Rico no tienen jurisdicción sobre Tradition hasta tanto culmine el procedimiento de quiebras o así lo disponga el Tribunal federal.

**5. EL TPI COMETIÓ ERROR CRASO Y MANIFIESTO AL CONCLUIR QUE RUBIERA ESTUVO SUJETA A HOSTIGAMIENTO SEXUAL.**

**6. EL TPI COMETIÓ ERROR CRASO Y MANIFIESTO AL CONCLUIR QUE DOMÍNGUEZ Y ARAYA ESTUVIERON SUJETAS A REPRESALIAS.**

**7. EL TPI COMETIÓ ERROR CRASO Y MANIFIESTO AL CONCLUIR QUE LAS DEMANDANTES-APELADAS ESTUVIERON SUJETAS A UN DESPIDO CONSTRUCTIVO.**

**8. EL TPI COMETIÓ ERROR CRASO Y MANIFIESTO Y ABUSÓ EN LA APLICACIÓN DEL DERECHO AL CONCEDER UNA CAUSA DE ACCIÓN POR ALEGADO HOSTIGAMIENTO/ACOSO LABORAL BAJO LA CONSTITUCIÓN DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO.**

**9. EL TPI COMETIÓ ERROR CRASO Y MANIFIESTO Y ABUSÓ DE SU DISCRECIÓN AL CONCEDER LAS PARTIDAS DE DAÑOS EMOCIONALES A LAS TRES DEMANDANTES-APELADAS.**

> **A. EL TPI IGNORÓ QUE LAS DEMANDANTES-APELADAS NO DESCARGARON EL PESO DE LA PRUEBA PARA ESTABLECER DAÑOS EMOCIONALES.**
> **B. EL TPI IGNORÓ EL DERECHO APLICABLE AL CONCEDER LAS PARTIDAS DE DAÑOS EMOCIONALES.**

**10. EL TPI COMETIÓ ERROR CRASO Y MANIFIESTO Y ABUSÓ DE SU DISCRECIÓN AL CONCEDER PARTIDAS DE SALARIOS DEJADOS DE DEVENGAR Y SALARIOS FUTUROS A LAS 3 DEMANDANTES-APELADAS.**

> **A. EL TPI IGNORÓ EL DERECHO APLICABLE AL CONCEDER LAS PARTIDAS DE SALARIOS DEJADOS DE DEVENGAR ("BACK PAY") Y SALARIOS FUTUROS ("FRONT PAY").**
>
> > **I. EL TPI COMETIÓ ERROR MANIFIESTO Y ABUSÓ DE SU DISCRECIÓN AL IGNORAR QUE LAS DEMANDANTES-APELANTES NO ESTABLECIERON QUE NO HAN PODIDO OBTENER EMPLEO COMPARABLE.**
> >
> > **II. EL TPI COMETIÓ ERROR CRASO Y MANIFIESTO Y ABUSÓ DE SU DISCRECIÓN AL IGNORAR LA DEFENSA DE FALTA DE MITIGACIÓN DE DAÑOS, IGNORAR EL REQUISITO DE DESCONTAR LAS PARTIDAS QUE DEVENGARON LAS DEMANDANTES-APELADAS LUEGO DE SUS RENUNCIAS E IGNORAR LOS PERIODOS DE CIERRES Y LIMITACIONES POR COVID.**

**III. EL TPI COMETIÓ ERROR MANIFIESTO Y ABUSÓ DE SU DISCRECIÓN AL CONCEDER PARTIDAS POR SALARIOS FUTUROS HASTA LOS 75 AÑOS A ARAYA Y POR TIEMPO DESCONOCIDO A DOMÍNGUEZ Y A RUBIERA.**

**11. EL TPI COMETIÓ ERROR CRASO Y MANIFIESTO Y ERRÓ EN LA APLICACIÓN DEL DERECHO AL IMPONER RESPONSABILIDAD INDIVIDUAL AL SR. PÉREZ.**

**II.**

**A.**

"[L]a sentencia que dicta un Juez de Primera Instancia es el producto final de un activo y complejo proceso forense". L. Rivera Román, *La apreciación de prueba en el Tribunal de Primera Instancia y en el Tribunal de Apelaciones* en *Perspectivas en la práctica apelativa*, San Juan, Ed. SITUM, 2018, pág. 101. Estas gozan de una presunción de corrección y la parte que impugne una determinación del Tribunal de Primera Instancia tiene el peso de la prueba para refutarla. *Íd.*

En vista de lo anterior, los foros apelativos debemos brindar deferencia a las determinaciones de hechos formuladas por el tribunal de instancia. *Serrano Muñoz v. Auxilio Mutuo*, 171 DPR 717, 740 (2007). Esta deferencia yace en que el foro primario está en mejor posición que un tribunal apelativo para realizar la determinación de credibilidad. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 771 (2013). Se le impone un respeto a la labor del tribunal de instancia en aquilatar la credibilidad, dado que los foros apelativos sólo poseemos récords mudos e inexpresivos. *Ramírez Ferrer v. Conagra Foods PR*, 175 DPR 799, 811 (2009); *Pérez Cruz v. Hospital La Concepción*, 115 DPR 721, 728 (1984). Pues, en gran medida, la determinación de credibilidad depende de observar la manera en que la persona testigo declara, apreciar sus gestos, titubeos, contradicciones, entre otros factores que van formando

gradualmente la convicción en cuanto a la verdad en la conciencia de la persona juzgadora. *Suárez Cáceres v. Com. Estatal Elecciones*, 176 DPR 31, 67-68 (2009).

Cónsono con lo anterior, la Regla 42.2 de Procedimiento Civil, 32 LPR Ap. V, R. 42.2, dispone que "[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos". De esta forma, en ausencia de error manifiesto, prejuicio, parcialidad o pasión, los tribunales apelativos no intervendremos con la apreciación de la prueba, la adjudicación de credibilidad ni las determinaciones de hechos efectuadas por el foro primario. *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 778 (2022); *Sucn. Pagán Berrios v. UPR y otros*, 206 DPR 317, 336 (2021); *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021).

Se incurre en prejuicio, parcialidad o pasión, cuando la persona juzgadora actúa motivada "por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que se someta prueba alguna". *Dávila Nieves v. Meléndez Marín, supra*, pág. 782. Además, "el error manifiesto ocurre cuando el foro apelativo queda convencido de que se cometió un error, a pesar de que haya evidencia que sostenga las conclusiones de hecho del tribunal, porque existe un conflicto entre las conclusiones y el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida". *Ortiz Ortiz v. Medtronic, supra*, pág. 779.

De otra forma, únicamente se alterará el dictamen del tribunal de instancia en una circunstancia de error manifiesto cuando, de un examen detenido de toda la prueba, el foro apelativo esté

convencido que la persona juzgadora descartó injustificadamente elementos probatorios importantes o fundó su criterio en testimonios de escaso valor o inherentemente improbables o increíbles. *C. Brewer PR, Inc. v. Rodríguez*, 100 DPR 826, 830 (1972). Por ello, nuestra facultad para sustituir el criterio del foro primario está limitada a las instancias en las que, a la luz de la prueba admitida, no existe base suficiente para apoyar su determinación. *Ortiz Ortiz v. Medtronic, supra.* Por otro lado, los tribunales apelativos nos encontramos en la misma posición del foro primario para evaluar la prueba documental o pericial que fundamentan las determinaciones de hecho. *Sucn. Rosado v. Acevedo Marrero*, 196 DPR 884, 918 (2016); *González Hernández v. González Hernández*, 181 DPR 746, 777 (2011).

**B.**

Es patentemente incompatible con nuestro ordenamiento jurídico y principios constitucionales que una persona sea despedida de su empleo sin razón que lo justifique. La Constitución de Puerto Rico, Const. ELA [Const. PR], LPRA Tomo I, establece una política pública expresa y sin ambigüedades en contra del discrimen. La Sección 1, del Artículo II de la Constitución dispone que:

> La dignidad del ser humano es inviolable. Todos los hombres son iguales ante la Ley. **No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas**. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana.

> *Íd.* (Énfasis nuestro).

La prohibición de discrimen contenida en la Sección 1 opera *ex propio vigore*. "[S]e trata de un mínimo constitucional que debe ser puesto en vigor, independientemente de la existencia de una canalización estatutaria". J.M. Farinacci Fernós, *La Carta de Derechos*, 1ª ed. rev., San Juan, Ed. UIPR, 2021, pág. 58. "[L]o

dispuesto en esta norma es de carácter **irrenunciable**, pues, más que un derecho individual, se trata de un mandato del sistema constitucional en cuanto al desarrollo de la sociedad y la conducta colectiva". *Íd.* (Énfasis en la original).

En el ámbito laboral, nos dicen los profesores Charles Zeno Santiago y Víctor M. Bermúdez Pérez que los "patrones de conducta discriminatorios chocan seriamente contra los principios y valores éticos y morales de la sociedad". C. Zeno Santiago & V.M. Bermúdez Pérez, *Tratado de derecho del trabajo*, 1ª ed. rev., San Juan, Ed. SITUM, 2014, Tomo II, pág. 15. "Se hace asimismo imperativo legislar para dar una eficaz protección a los trabajadores contra discrímenes por razón de raza, color, religión, origen o condición social de los empleados o aspirantes a empleo". *Íd.*, pág. 43. En miras de extender dichas protecciones constitucionales al ámbito laboral, el 30 de junio de 1959, la Asamblea Legislativa aprobó la Ley Núm. 100, *supra*. De manera clara y enfática, el Artículo 1 de la Ley Núm. 100 establece una prohibición en contra del discrimen por edad, sexo u origen nacional en el empleo. La Ley establece que todo patrono que despida, suspenda o discrimine contra un empleado por su edad, sexo u origen nacional:

> (a) Incurrirá en responsabilidad civil:
> (1) Por una suma igual al doble del importe de los daños que el acto haya causado al empleado o solicitante de empleo;
> (2) o por una suma no menor de quinientos dólares ($500) ni mayor de dos mil dólares ($2,000), a discreción del tribunal, si no se pudieren determinar daños pecuniarios;
> (3) o el doble de la cantidad de los daños ocasionados, si ésta fuere inferior a la suma de quinientos dólares ($500), e
> (b) incurrirá, además, en un delito menos grave y, convicto que fuere, será castigado con multa de hasta cinco mil dólares ($5,000), o cárcel por un término no mayor de noventa (90) días, o ambas penas, a discreción del tribunal.
>
> Artículo 1, *Íd.*

Por su parte, el Artículo 3 de la Ley Núm. 100 establece una presunción controvertible, disponiendo que "[s]e presumirá que cualquiera de los actos mencionados en las secciones precedentes fue cometido en violación [del Artículo 1, entre otros,] de este título, cuando el mismo haya sido realizado sin justa causa. Esta presunción será de carácter controvertible". Dicha presunción opera de la siguiente manera:

> [U]na vez presentada la demanda, le corresponde a la parte demandante en la vista en su fondo comenzar con la presentación de la prueba de sus alegaciones, antes de que la parte demandada venga obligada a rebatirla. Si la parte demandante no presenta prueba suficiente para sostener sus alegaciones, la parte demandada no tiene que defenderse, procede la desestimación de la demanda en esta etapa.
> [...]
> El peso de la prueba para establecer las bases de su reclamación le continúa correspondiendo inicialmente al empleado. **Éste tiene que comenzar presentando prueba que demuestre, primero, que hubo un despido o acto perjudicial**; segundo, que **éste se realizó sin justa causa**; y tercero, **algún hecho base que lo ubique dentro de la modalidad de discrimen bajo la cual reclama**. Una vez el empleado cumple con esta primera fase surge la presunción de discrimen del Art. 3. Es decir, **el empleado no tiene que probar el acto discriminatorio que es objeto de la presunción**.
> [...]
> [S]i el patrono decide defenderse, tiene varias alternativas. Éste puede presentar prueba que rebata la presunción de discrimen activada por el empleado; o puede optar por presentar prueba de que el despido fue justificado; o que no hubo tal despido; o que a pesar de haber habido un despido injustificado éste no fue discriminatorio.
>
> *S.L.G. Hernández-Beltrán v. TOLIC*, 151 DPR 754, 774-775 (2000). (Énfasis nuestro).

"Si el patrono no presenta prueba alguna en esta etapa, se considera que el empleado ha probado su caso de discrimen, por lo que **sólo resta la presentación de la prueba sobre los daños**". *Íd.*, pág. 775. (Énfasis nuestro). De esta manera, el Tribunal Supremo pautó los elementos esenciales con los cuales un empleado debe cumplir para establecer un caso *prima facie* de discrimen. Estos son: (1) que hubo un despido o acción perjudicial; (2) que éste se realizó sin justa causa; y, (3) tiene que presentar evidencia indicativa de la

modalidad de discrimen que se vincula a su despido. *Íd.*, pág. 776; *López Fantauzzi v. 100% Natural,* 181 DPR 92, 124 (2011); *Díaz v. Wyndham Hotel Corp.,* 155 DPR 364, 389, esc. 44 (2001).

En el caso de una reclamación al amparo de la Ley Núm. 100, "es inevitable la necesidad de establecer la intención del patrono, por lo que **el factor [de] credibilidad desempeña un papel importantísimo en el resultado de la reclamación**". C. Zeno Santiago & V.M. Bermúdez Pérez, *op. cit.*, pág. 344. (Énfasis nuestro).

### C.

Nuestro ordenamiento estatutario castiga el despido sin justa causa. Lo que constituye justa causa para un despido no está definido por la Ley Núm. 100, *supra.* Sin embargo, nuestro Tribunal Supremo ha resuelto que:

> Aun cuando la Ley Núm. 100, ante, no contenga una definición de lo que constituye justa causa para un despido, en buena hermenéutica, recurrimos al principio de aplicar e interpretar otras leyes *in pari materia*; ciertamente, las disposiciones sobre justa causa de la Ley de Despido Injustificado sirven de punto de referencia al interpretar la Ley Núm. 100.
>
> *Díaz v. Wyndham Hotel Corp.*, *supra*, pág. 390, esc. 47. (Cita omitida).

En consecuencia, podemos utilizar la Ley Núm. 80, *supra,* para auscultar lo que constituye justa causa para un despido. En nuestra jurisdicción, la Ley Núm. 80, *supra,* regula las circunstancias en que un patrono privado puede despedir a un empleado, así clasificando lo que constituiría un despido injustificado. Para esto, el Artículo 2 de la Ley 80 dispone que:

> Se entenderá por justa causa para el despido de un empleado aquella que no esté motivada por razones legalmente prohibidas y que no sea producto del mero capricho del patrono. Además, se entenderá por justa causa aquellas razones que afecten el buen y normal funcionamiento de un establecimiento que incluyen, entre otras, las siguientes:
> (a) Que el empleado incurra en un patrón de conducta impropia o desordenada.

(b) Que el empleado incurra en un patrón de desempeño deficiente, ineficiente, insatisfactorio, pobre, tardío o negligente. Esto incluye incumplir con normas y estándares de calidad y seguridad del patrono, baja productividad, falta de competencia o habilidad para realizar el trabajo a niveles razonables requeridos por el patrono y quejas repetidas de los clientes del patrono.

(c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidos para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.

(d) Cierre total, temporero o parcial de las operaciones del establecimiento. En aquellos casos en que el patrono posea más de una oficina, fábrica, sucursal o planta, el cierre total, temporero o parcial de las operaciones de cualquiera de estos establecimientos donde labora el empleado despedido, constituirá justa causa para el despido a tenor con este Artículo.

(e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.

(f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido o con el propósito de aumentar la competitividad o productividad del establecimiento.

**No se considerará justa causa para el despido de un empleado la colaboración o expresiones hechas por éste, relacionadas con el negocio de su patrono, en una investigación ante cualquier foro administrativo, judicial o legislativo en Puerto Rico, cuando dichas expresiones no sean de carácter difamatorio ni constituyan divulgación de información privilegiada según la ley**. En este último caso, el empleado así despedido tendrá derecho, además de cualquier otra adjudicación que correspondiere, a que se ordene su inmediata restitución en el empleo y a que se le compense por una cantidad igual a los salarios y beneficios dejados de percibir desde la fecha del despido hasta que un tribunal ordene la reposición en el empleo.

Artículo 2, *Íd.* (Énfasis nuestro).

Cónsono con anterior, el Tribunal Supremo ha "reiterado, en un sinnúmero de ocasiones, que bajo las disposiciones de la referida Ley Núm. 80 constituye justa causa para el despido aquella que tiene su origen, no ya en el libre arbitrio o capricho del patrono, sino aquella vinculada a la ordenada marcha y normal funcionamiento de la empresa en cuestión". *Díaz v. Wyndham Hotel Corp.*, *supra*, págs. 376-377.

Ahora bien, la frase "despido injustificado" puede causar que se concluya incorrectamente que una acción al amparo de la Ley Núm. 80 no puede ser instada cuando un empleado renuncia a su puesto voluntariamente. Nuestro Tribunal Supremo ha dejado claro que no es un hecho indispensable que el patrono haya despedido al empleado o que su renuncia haya sido involuntaria. *Rivera Figueroa v. The Fuller Brush Co.*, 180 DPR 894, 907 (2011).

> [L]a definición de la Ley 80 es bastante amplia, pues **abarca, no sólo la acción unilateral del patrono dirigida a cesantear al empleado**, **sino las acciones dirigidas a *inducirlo o forzarlo a renunciar***, tales como imponerle o intentar **imponerle condiciones de trabajo más onerosas, reducirle el salario, rebajarlo en categoría o someterlo a vejámenes o humillaciones de hecho o de palabra**.

*Íd.* (Énfasis nuestro).

La renuncia de un empleado luego de que el patrono cree un ambiente laboral en el que un empleado no puede tolerar trabajar es conocido como el despido constructivo, y nuestro Tribunal Supremo lo ha considerado una manifestación del despido injustificado. "En el despido constructivo, al empleado se le obliga a renunciar mediante la imposición de condiciones onerosas". *Íd.* "El ambiente en el empleo debe tornarse intolerable a tal nivel que la única alternativa razonable para el empleado afectado sea dimitir". *León Torres v. Rivera Lebrón*, 204 DPR 20, 39 (2020). "La intensidad y el alcance de la conducta patronal en controversia se examinarán desde una óptica objetiva y no desde la perspectiva del empleado promovente. Es decir, se evaluará 'si una persona razonable se sentiría forzada a renunciar como resultado de las acciones del patrono'". *Íd.* (citando a *Rivera Figueroa v. The Fuller Brush Co., supra,* pág. 908).

### D.

El discrimen por sexo o género constituye una violación crasa de nuestros principios constitucionales y sociales. Debido al

carácter irrenunciable de esta protección constitucional, resulta incompatible que una trabajadora renuncie "a su derecho a no ser discriminada y acepta condiciones de empleo peores que las ofrecidas a un hombre". J.M. Farinacci Fernós, *op. cit.*, pág. 58. "En este caso, **el patrono no podría presentar como defensa la aceptación de la trabajadora como indicativo de una renuncia a sus derechos bajo [la Sección 1 de nuestra Constitución]**". *Íd.*, págs. 58-59. (Énfasis nuestro).

Pese a que la Ley Núm. 100 ya había codificado una prohibición general en contra del discrimen por sexo en el ámbito laboral, la Asamblea Legislativa estimó necesario fortalecer las disposiciones relativas a la misma mediante legislación específica. En consecuencia, el 6 de julio de 1985, se aprobó la Ley Núm. 69, *supra*, para "requerir el estricto cumplimiento del derecho de la mujer a tener igualdad en el empleo y que no se discrimine por razón de su sexo [...]". *Íd.*, Exposición de Motivos. Además, procura "garantizar la igualdad de derecho al empleo tanto del hombre como de la mujer, prohibiendo las actuaciones de los que promueven el discrimen, fijando responsabilidades e imponiendo penalidades". Artículo 1, *Íd.* Por tratarse de una legislación más específica, nuestro Tribunal Supremo ha establecido "que las disposiciones de la Ley Núm. 69, *supra*, prevalecen sobre las provistas en la Ley Núm. 100, *supra*, respecto a la prohibición del discrimen por razón de sexo en el ámbito laboral". *López Fantauzzi v. 100% Natural, supra*, págs. 125-126. El Artículo 3 de la Ley Núm. 69 dispone que:

> Será práctica ilegal de empleo el que un patrono:
>
> (1) cuando por razón de su sexo, suspenda, rehúse emplear o despida cualquier persona, o que de cualquier otra forma discrimine contra una persona, con respecto a su compensación, términos o condiciones de empleo.
>
> **(2) cuando por razón de su sexo limite, divida o clasifique sus empleados** o a las personas que soliciten para un empleo, en cualquier forma que la

pueda privar o tienda a privar a esa persona de una oportunidad de empleo o **que de cualquier otra forma le pueda afectar adversamente su condición como empleado**.

Artículo 3, Ley Núm. 69, *supra*. (Énfasis nuestro).

El segundo postulado del Artículo 3 prohíbe que un patrono cree o fomente un ambiente laboral adverso u hostil para una empleada por razón de ser mujer. Por lo tanto, la prohibición que establece la Ley Núm. 69 no está limitada al momento del empleo o del despido, sino también aplica a las condiciones laborales fomentadas por el patrono o ambiente permitido.

**E.**

El discrimen por sexo se manifiesta en dos maneras: (1) discrimen por el género de la persona; y, (2) discrimen por hostigamiento sexual. *Albino v. Ángel Martínez, Inc.*, 171 DPR 457, 470 (2007). La Ley para Prohibir el Hostigamiento Sexual en el Empleo, Ley Núm. 17 de 22 de abril de 1988, 29 LPRA sec. 155 (Ley Núm. 17), dispone que:

> El hostigamiento sexual en el empleo consiste en **cualquier tipo de acercamiento sexual no deseado** requerimientos de favores sexuales y cualquier otra **conducta verbal o física de naturaleza sexual** o que sea reproducida utilizando cualquier medio de comunicación incluyendo, pero sin limitarse, al uso de herramientas de multimedios a través de la red cibernética o por cualquier medio electrónico, cuando se da una o más de las siguientes circunstancias:
>
> (a) Cuando el someterse a dicha conducta se convierte de forma implícita o explícita en un término o condición del empleo de una persona.
>
> (b) Cuando el sometimiento o rechazo a dicha conducta por parte de la persona se convierte en fundamento para la toma de decisiones en el empleo o respecto del empleo que afectan a esa persona.
>
> **(c) Cuando esa conducta tiene el efecto o propósito de interferir de manera irrazonable con el desempeño del trabajo de esa persona o cuando crea un ambiente de trabajo intimidante hostil u ofensivo**.

*Íd*. (Énfasis nuestro).

La modalidad de hostigamiento sexual descrita en el inciso (c) de la Ley Núm. 17 recoge el hostigamiento sexual por ambiente hostil. En *Albino v. Ángel Martínez Inc., supra*, el Tribunal Supremo pautó que:

> La modalidad de hostigamiento sexual por ambiente hostil se produce **cuando la conducta sexual hacia una persona tiene el efecto de interferir irrazonablemente con el desempeño de su trabajo o de crear un ambiente laboral intimidante, hostil u ofensivo**. La justiciabilidad de una reclamación por ambiente hostil no requiere que dicha conducta produzca un daño económico y tampoco es indispensable que ésta sea de naturaleza explícitamente sexual; **basta con que el hostigamiento o trato desigual se dirija a la persona únicamente por razón de su género**. La conducta constitutiva de hostigamiento **debe ser lo suficientemente severa y ofensiva como para alterar las condiciones del empleo y crear un ambiente de trabajo abusivo**. Este examen **debe realizarse tomando en consideración factores como la naturaleza de la conducta alegada, su frecuencia e intensidad, el contexto en el que ocurre, su duración, y la conducta y circunstancias personales de la alegada víctima**.

*Íd.*, pág. 472. (Énfasis nuestro).

**F.**

Los cambios tecnológicos y los avances médicos han propiciado un aumento en la expectativa y calidad de vida, lo que ha permitido que las personas continúen trabajando en su vejez. No obstante, esto también ha traído consigo un aumento en los casos de discrimen por edad, proscrito por la Sección 1 del Artículo II de nuestra Constitución, *supra*, y la Ley Núm. 100, *supra*.

No existe un límite hasta cuándo una persona puede trabajar. "[E]n cuanto a la prohibición de discrimen por edad, actualmente, la Ley Núm. 100, *supra*, no tiene un límite específico". C. Zeno Santiago & V.M. Bermúdez Pérez, *op. cit.*, pág. 338. Las leyes aplicables únicamente establecen edades mínimas para que los menores puedan trabajar legalmente.

> Conforme dispone la Ley Núm. 100, **la edad del empleado no es criterio de relevancia para determinar si se está o no cualificado para un empleo**. De lo contrario, tendríamos que concluir que

el legislador arropó con el manto de protección de la Ley Núm. 100 a un grupo de personas no cualificadas para desempeñar las labores de su empleo. En atención a ello resolvemos que como resultado de la eliminación de la edad máxima protegida establecida en la Ley Núm. 100, esta *ley no establece una edad específica hasta la cual una persona está cualificada para trabajar.*

*Mestres Dosal v. Dosal Escandón,* 173 DPR 62, 73-74 (2008).

Un empleado tiene derecho a que se le compense por daños, incluyendo la pérdida de ingresos futuros hasta la edad de retiro. *Odriozola v. Cosmetics Dist. Corp.,* 116 DPR 485, 509 (1985). El hecho de haber cumplido la edad de retiro no proscribe una acción de discrimen por edad, por lo que no constituye justa causa el despido de un empleado que haya cumplido los sesenta y cinco (65) años. Por lo tanto, al momento de establecer la edad hasta la que se deben calcular la pérdida de ingresos futuros, los tribunales deben considerar, en un análisis caso por caso, "si el empleado despedido tiene una probabilidad real de obtener otro empleo similar y, de concluirse que no existe tal probabilidad, procede vislumbrar si la entidad para la cual trabajaba mantenía o no una política legítima de retiro obligatorio". *Íd.*, pág. 76.

Si el empleado no está cualificado para desempeñar las funciones de su empleo, el patrono no incurre en conducta discriminatoria. Por otro lado, cuando el patrono tenga una política de retiro obligatorio, esta será la edad máxima para calcular los ingresos futuros. No obstante, cuando el empleado está cualificado y la empresa no tiene una política de retiro obligatorio, "***será necesario establecer la edad hasta la cual, con mayor probabilidad, dicho empleado estaría cualificado para realizar las labores de su empleo y, en efecto, las hubiese realizado de no haber sido despedido***". *Íd.*, pág. 77. (Énfasis nuestro y en la original). Los tribunales deben tomar en consideración varios factores como "[e]l estado de salud de la

persona, sus hábitos de trabajo, la ocupación que ostenta o la naturaleza del trabajo que desempeña [...]". *Íd.*, pág. 78.

En el caso particular del discrimen por edad, nuestro Tribunal Supremo ha determinado que:

> *En reclamaciones por despido discriminatorio por edad específicamente, el demandante tiene que presentar prueba en el primer turno, que tienda a establecer, por ejemplo, que* (i) pertenece a la clase protegida por el estatuto, a saber, su edad; *o* (ii) que estaba cualificado para ejercer el puesto que ocupaba; *o* (iii) que fue despedido, *o* (iv) que fue sustituido por una persona más joven, esto es, algún hecho base que lo ubique dentro de la modalidad de discrimen bajo la cual reclama. Es menester advertir que **el empleado *no* tiene que probar todos y cada uno de estos elementos**, ya que, de así requerírsele, se le estaría exigiendo que cumpla con una obligación procesal que no le corresponde llevar a cabo al instar su reclamación por discrimen estrictamente bajo las disposiciones de la Ley Núm. 100, ante, local.
>
> *Díaz v. Wyndham Hotel Corp.*, *supra*, págs. 389-390. (Énfasis nuestro).

## G.

"[E]n Puerto Rico existe una clara política pública, de origen, tanto constitucional como estatutario, que prohíbe el discrimen por razón de nacionalidad". *Santini Rivera v. Serv. Air, Inc.*, 137 DPR 1, 13 (1994). La nacionalidad de uno se refiere al país donde nace un individuo o de donde provienen sus ancestros. C. Zeno Santiago & V.M. Bermúdez Pérez, *op. cit.*, pág. 291. Tanto la Ley Núm. 100, *supra*, como el Título VII de la Ley Federal de Derechos Civiles, 42 USCA sec. 2000e-2 (Título VII), establecen prohibiciones en contra del discrimen en el empleo a base del origen nacional del empleado. Al igual que otras acciones de discrimen contempladas por la Ley Núm. 100, es el deber del empleado establecer un caso *prima facie* y luego el del patrono rebatirlo.

## H.

"Originalmente, se percibían las quejas de los empleados contra supervisores o ejecutivos empresariales como una falta de lealtad o desobediencia imperdonable". C. Zeno Santiago & V.M.

Bermúdez Pérez, *op. cit.*, pág. 353. Esta situación ponía al empleado en una posición aún más desventajada con relación a su patrono e impedía su habilidad para solicitar y luchar por mejores condiciones de trabajo. Ante esta realidad, y la abundante política pública a favor de las protecciones para los empleados, el 20 de diciembre de 1991, la Asamblea Legislativa aprobó la Ley Núm. 115, *supra*, en aras de proteger a los empleados de represalias por ofrecer testimonios o quejas sobre sus patronos y condiciones de trabajo. *Íd.*, Exposición de Motivos.

La Ley Núm. 115 "establece para el empleado una causa de acción en contra de su patrono cuando este lo ha despedido, amenazado o sometido a algún discrimen en el empleo por haber ofrecido testimonio ante un foro legislativo, administrativo o judicial". C. Zeno Santiago & V.M. Bermúdez Pérez, *op. cit.*, pág. 360. La Ley Núm. 115, además, tuvo el efecto de enmendar la Ley Núm. 80 para establecer que el hecho de que un empleado ofrezca testimonio o presente quejas ante uno de los foros contemplados por la ley no constituye justa causa para su despido. El Artículo 2 (a) de la Ley Núm. 115 describe la conducta proscrita. Esta dispone que:

> Ningún patrono podrá despedir, amenazar o discriminar contra un empleado con relación a los términos, condiciones, compensación, ubicación, beneficios o privilegios del empleo porque el empleado ofrezca o intente ofrecer, verbalmente o por escrito, cualquier testimonio, expresión o información ante un foro legislativo, administrativo o judicial en Puerto Rico, así como el testimonio, expresión o información que ofrezca o intente ofrecer, verbalmente o por escrito, en los procedimientos internos establecidos de la empresa, o ante cualquier empleado o representante en una posición de autoridad, cuando dichas expresiones no sean de carácter difamatorio ni constituyan divulgación de información privilegiada establecida por ley.

Artículo 2 (a), Ley Núm. 115, *supra*.

El Artículo 2 (c), por su parte, establece que un empleado tiene dos vías para establecer un caso al amparo de la Ley Núm. 115: (a) probar la violación mediante evidencia directa o circunstancial, o (b)

establecer la presunción juris tantum de la ley. "Un empleado establece un caso *prima facie* o una presunción a su favor cuando prueba que: (1) participó en una actividad protegida por la ley y (2) subsiguientemente fue despedido, amenazado o discriminado en su empleo". *S.L.G. Rivera Carrasquillo v. A.A.A.*, 177 DPR 345, 362 (2009).

## I.

Con relación a los daños, como cuestión de umbral, los tribunales de instancia tienen:

> [l]a necesidad de medir los daños y perjuicios en cada caso sobre una estricta base de correspondencia con la prueba, siempre procurando que la indemnización de los daños y perjuicios no se convierta en una industria y no resulte tan lesiva a nuestra economía— *Toro Mercado v. P.R. & Amer. Ins. Co.*, 87 D.P.R. 658 (Blanco Lugo) (1963), cita precisa a la pág. 660— como en algún momento anterior, resultó ser la tendencia a no compensar debidamente el daño. Usando de las palabras de nuestro ilustrado compañero Juez señor Santana Becerra podríamos añadir: 'Este menester de los Jueces [fijación de daños] **debe estar presidido por un sano juicio y por criterios razonables y ponderados en la evaluación de cada caso, con objetividad de la realidad probada, de modo que siempre se conserve el sentido remediador del resarcimiento, que impone el Art. 1802 y el accidente no sea motivo de especulación o ganancia**.' *Vda. de Valentín v. E.L.A.*, 84 D.P.R. 112 (Santana Becerra) (1961), cita precisa a la pág. 123.
>
> *Atiles Moreu, Admor c. McClurg*, 87, DPR 865, 877 (1963). (Énfasis nuestro).

Ahora bien, probado un caso de discrimen en el trabajo y de despido injustificado, la parte demandante tiene derecho a ser compensada. Las leyes laborales establecen distintas indemnizaciones a los que los empleados discriminados tienen derecho a recobrar. La Ley Núm. 100, *supra,* por su parte, dispone que todo patrono que despida, suspenda o discrimine contra un empleado por su edad, sexo u origen nacional:

> (a) Incurrirá en responsabilidad civil:
> (1) **Por una suma igual al doble del importe de los daños que el acto haya causado al empleado o solicitante de empleo**;

(2) o por una suma no menor de quinientos dólares ($500) ni mayor de dos mil dólares ($2,000), a discreción del tribunal, si no se pudieren determinar daños pecuniarios;

(3) o el doble de la cantidad de los daños ocasionados, si ésta fuere inferior a la suma de quinientos dólares ($500), e

(b) incurrirá, además, en un delito menos grave y, convicto que fuere, será castigado con multa de hasta cinco mil dólares ($5,000), o cárcel por un término no mayor de noventa (90) días, o ambas penas, a discreción del tribunal.

Artículo 1, *Íd.* (Énfasis nuestro).

Por otro lado, el Artículo 1 de la Ley Núm. 80, *supra*, establece el remedio conocido como la mesada. Este dispone que:

Todo empleado que trabaja para un patrono mediante remuneración, contratado sin tiempo determinado, que fuere despedido sin que haya mediado una justa causa, tendrá derecho a recibir de su patrono por concepto de indemnización por despido lo siguiente:

(a) Una cantidad equivalente a tres (3) meses de sueldo por concepto de indemnización, siempre y cuando haya culminado el periodo probatorio aplicable según se dispone en esta Ley, o el periodo probatorio distinto que las partes hayan estipulado; y

(b) Una cantidad equivalente a dos (2) semanas de sueldo por cada año completo de servicio.

En ningún caso la indemnización requerida bajo esta Ley excederá el sueldo correspondiente a nueve (9) meses de sueldo. **El tope de nueve (9) meses no será de aplicación a empleados contratados previo a la vigencia de la "Ley de Transformación y Flexibilidad Laboral".** La indemnización de tales empleados, en caso de un despido injustificado, se calculará utilizando el estado de derecho previo a la entrada en vigor de la "Ley de Transformación y Flexibilidad Laboral". Para fines de este Artículo, se entenderá que un (1) mes está compuesto por cuatro (4) semanas.

Artículo 1, *Íd.*

Como adelanta el Artículo 1 de la Ley Núm. 80, la Ley de Transformación y Flexibilidad Laboral, Ley Núm. 4-2017, 29 LPRA sec. 121 *et seq.* (Reforma Laboral de 2017), enmendó el cálculo para la mesada. Sin embargo, los empleados contratados antes de la aprobación de la Reforma Laboral de 2017 estarán regidos por las normas dispuestas en la Ley Núm. 80 antes de sus enmiendas. Bajo

el esquema vigente previo la aprobación de la Reforma Laboral de 2017, la mesada se calculaba de la siguiente manera:

| Años de Servicio | Indemnización |
|---|---|
| 0-5 | 2 meses + 1 semana por año de servicio |
| 5-15 | 3 meses + 2 semanas por año de servicio |
| 15+ | 6 meses + 3 semanas por año de servicio |

Contrario a la normativa actual, el cálculo utilizado antes de las enmiendas del 2017 no contemplaba un tope. Por otro lado, el Artículo 7 de la Ley Núm. 80 dispone que:

Artículo 7. — Mesada de la compensación e indemnización.

La mesada de la compensación y la indemnización progresiva por cesantía sin justa causa, provista en el Artículo 1 de esta Ley, se computará a base del mayor número de horas regulares de trabajo del empleado, durante cualquier período de treinta (30) días naturales consecutivos, dentro del año inmediatamente anterior al despido.

*Íd.*

Para propósitos de la mesada, la palabra "sueldo" significa:

[E]l salario regularmente devengado por el empleado por sus servicios, incluyendo la compensación por comisiones y otros pagos de incentivos regularmente realizados. **No incluirá** el valor de beneficios marginales, pagos de beneficios por incapacidad, enfermedad ni vacaciones, bonos voluntarios o requeridos por ley, compensación diferida, acciones, opciones para la compra de acciones, **aquella parte de propinas recibidas que excedan la cuantía utilizada para cumplir con el pago del salario mínimo legal**, ni los cargos por servicios requeridos por el patrono y que subsiguientemente comparta en todo o parte, con sus empleados.

Artículo 14 (h), *Íd.* (Énfasis nuestro).

Ahora bien, nuestro Tribunal Supremo ha resuelto que ante causas de acción presentadas simultáneamente al amparo de la Ley Núm. 80 y la Ley Núm. 100, no procede una indemnización bajo ambas leyes. *S.L.G. Afanador v. Roger Electric Co., Inc.,* 156 DPR 651, 667 (2002). "[E]llo constituiría una doble penalización motivada

por unos mismos hechos". *Íd.* "Habida cuenta de que **los remedios a los cuales tiene derecho un empleado que ha sido discriminado compensan adecuadamente todos los daños que pretende atender la citada Ley Núm. 80**, en cuanto a ello respecta esta disposición legal queda excluida del panorama adjudicativo". *Íd.*, págs. 667-668. (Énfasis nuestro). Por lo tanto, la compensación que provee la Ley Núm. 100 es una global, que contempla la mesada y otros daños sufridos. "En estos casos, el tribunal de instancia concederá el remedio que proceda bajo una u otra ley, *a base de lo que sea más beneficioso para la trabajadora*, según la prueba[...]". *Soc. de Gananciales v. Centro Gráfico*, 144 DPR 952, 965 (1998). Así, determinado que la compensación al amparo de la Ley Núm. 100 procede sobre la contemplada por la Ley Núm. 80, de esta compensación se restará la mesada, puesto que su concesión constituiría una doble indemnización por los mismos hechos. *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 212 (2021) ("Si esta procede y se demuestra que al obrero le corresponde una cuantía mayor en concepto de daños, entonces hay que rebajarle a la compensación mayor la cantidad previamente concedida bajo la otra ley". (Cita omitida)). Dicho descuento se realizará luego de la imposición de la doble penalidad de la Ley Núm. 100. *Íd.*, pág. 199.

Entre los daños reconocidos, existe el "backpay" y el "frontpay", que también son conocidos como los salarios dejados de devengar y la pérdida de ingresos futuros. Cuando es posible la reposición, sólo procederá la indemnización por salarios dejado de devengar; cuando no es posible la reposición, procederá además la indemnización por la pérdida de ingresos futuros. *S.L.G. Afandor v. Roger Electric Co., Inc., supra*, pág. 669. "La paga atrasada es la compensación por los haberes dejados de percibir desde el despido hasta la fecha de la sentencia, **descontando los ingresos que durante ese período obtuvo la parte demandante**". *Ramírez Ferrer*

*v. Conagra Foods PR, supra,* pág. 823. (Énfasis nuestro). **Dicho descuento debe realizarse antes de aplicar la doble penalidad de la Ley Núm. 100**. *Torres Rivera v. Econo Rial, Inc.*, 208 DPR 346, 366 (2021). "El propósito de realizar el referido descuento a la cuantía en concepto de salarios dejados de percibir es poner en vigor el carácter reparador y no punitivo de los estatutos laborales que establece dicho remedio". *Íd.*, pág. 359. "Lo contrario tendría el efecto de alterar la naturaleza reparadora de los estatutos que proveen este remedio a una con carácter punitivo". *Íd.*

Por otro lado, el Tribunal Supremo ha reconocido que el computo de la indemnización por la pérdida de ingresos futuros conlleva un tanto de especulación. No obstante:

> [e]n el desempeño de esta complicada tarea, los tribunales deben considerar, inter alia: si el demandante ha mitigado daños; si ha aportado evidencia de que, hasta la fecha de su retiro no iba ser posible obtener un trabajo comparable al que tenía previo a los actos discriminatorios; y si la fecha estimada de retiro es una plausible.

*Santiago Ortiz v. Real Legacy et al, supra*, pág. 670.

Los salarios dejados de devengar comprenderán el salario que hubiese devengado el empleado desde su despido hasta el momento que se dicte la sentencia en instancia. *Odriozola v. Cosmetic Dist. Corp., supra,* pág. 504. Por otro lado, "[l]os ingresos futuros calculados hasta la edad de retiro son una parte indispensable de la justa compensación a que el empleado discriminado por edad tiene derecho". *Íd.*, pág. 510. En los casos de discrimen por edad, donde el empleado no haya podido encontrar trabajo nuevo, comparable y es mayor de la edad de retiro, el cómputo deberá ser hasta la edad en la cual hubiese razonablemente podido ejercer su trabajo, considerando varios factores antes discutidos. *Mestres Dosal v. Dosal Escandón, supra.*

> Estos dos remedios, junto a la concesión de una compensación en concepto de daños morales, tienen como fin **colocar al perjudicado en una situación**

**similar a la que se encontraba justo antes de la acción ilegal**. Hemos resuelto que al igual que su contraparte federal, la Ley Núm. 100, *supra,* otorga el derecho a compensación por ingresos futuros en los casos en que no se pueda decretar la reinstalación del empleado a su puesto.

*Ramírez Ferrer v. Conagra Foods PR, supra,* pág. 819. (Énfasis nuestro).

Por lo tanto, la compensación por pérdida de ingresos futuros es obligatoria en los casos de discrimen por edad, en los que el empleado no puede ser reinstalado, aun pudiendo ejercer sus funciones de empleo. No obstante, en los otros casos por discrimen contemplados por la Ley Núm. 100, *supra,* sólo debe proceder la compensación por la pérdida de ingresos dejados de devengar si la parte **demandante no ha podido conseguir trabajo al momento de dictarse la sentencia**. De resolver lo contrario, los tribunales estarían concediendo una doble indemnización por los mismos hechos.

En cuanto a las angustias mentales a causa del discrimen que haya podido sufrir un empleado, estos están contemplados en la compensación que provee la Ley Núm. 100, *supra, Berríos Heredia v. González,* 151 DPR 327, 342 (2000). Recordemos que la Ley Núm. 100 permite "la compensación por daños sin limitación alguna en cuanto al tipo de daño". *Íd.* Aun así, el Artículo 6.1 de la Reforma Laboral de 2017, *supra,* dispone que:

> **En todos los casos de discrimen o represalia en el empleo**, un empleado, de prevalecer, tendrá derecho a ser compensado por la totalidad de los salarios y beneficios dejados de devengar, y en los casos apropiados, salarios y beneficios futuros. Cualquier disposición de ley sobre discrimen o represalia ilegal en el empleo que requiera compensar al empleado por el doble de los daños sufridos, continuará en vigor. No obstante, lo dispuesto en cualquier ley de discrimen o represalia ilegal en el empleo, **la cuantía de daños recobrables por concepto de angustias o sufrimientos mentales**, otros daños compensatorios y daños punitivos, de proceder, **quedarán sujeto a los siguientes límites monetarios**, a base de la cantidad de empleados del patrono:
> **Menos de 101 empleados: $50,000**
> 101 a 200 empleados: $100,000

> 201 a 500 empleados: $200,000
> 501 empleados o más: $300,000

*Íd*. (Énfasis nuestro).

Así, esta ley estableció un límite para el cómputo de los daños compensables causados por angustias mentales. Ahora bien, "[n]uestro sistema de derecho compensa las angustias mentales, pero requiere que no sean unas meras penas pasajeras. Debe probarse que en alguna medida apreciable el demandante quedó realmente afectado en su salud, bienestar o felicidad". A.J. Amadeo-Murga, *El valor de los daños en la responsabilidad civil*, 3ª ed. rev., Barcelona, Ed. Bosch, 2019, Tomo 1, pág. 179. "De ordinario, una reclamación en concepto de angustias mentales requiere la presentación de prueba pericial y documental, tanto para probar la validez de la reclamación como para que la parte adversa pueda defenderse adecuadamente". *Berríos Heredia v. González, supra*, pág. 345.

Finalmente, la Ley Núm. 100, *supra*, dispone que el patrono que discrimina en contra de un empleado por alguna de las razones contempladas por la ley compensará al empleado por el doble de los daños ocasionados. Artículo 1 (a) (1), *Íd.* "Después de adjudicado el discrimen, la doble penalidad de la Ley 100, [*Íd.*], abarca los daños patrimoniales y las angustias mentales". *Santiago Ortiz v. Real Legacy et al., supra*, pág. 212.

En cuanto a nuestro rol revisor, es norma reiterada que los tribunales apelativos no intervendrán en la concesión de daños salvo que estos sean extremadamente altos o ridículamente bajos, o los mismos no estén justificados por la prueba.

> La determinación de una compensación justa y razonable por los daños sufridos es tarea que constituirá un reto aun para un Salomón del siglo XX. La apreciación humana valorativa de elementos que no son ostensibles y visibles sino intangibles (emociones tales como dolor, alegría, tristeza, frustración, paz, tranquilidad del espíritu, honor y otras) no está exenta de cierto grado de especulación. Aspiramos a que toda

adjudicación sea razonablemente balanceada, esto es, ni extremadamente baja como tampoco desproporcionalmente alta.

*Riley v. Rodríguez Pacheco*, 119 DPR 762, 805 (1987). (Cita omitida).

## III.

Con el derecho aplicable esbozado, nos encontramos en posición para resolver los errores señalados por la parte Apelante.

Por estar íntimamente relacionados, atenderemos conjuntamente los primeros ocho errores señalados. Estos errores están relacionados con la apreciación de la prueba en las causas de acción por discrimen radicadas por las Demandantes.

Debemos resaltar que la apelación de una sentencia no constituye un segundo turno al bate para la parte perdedora en instancia. No es una oportunidad para que se litiguen los hechos nuevamente o pase prueba no presentada. Por esto, nuestra capacidad revisora está altamente limitada a determinar si el TPI abusó de su discreción, actuó con prejuicio o parcialidad o cometió algún error manifiesto de Derecho. A su vez, reconocemos la deferencia que le debemos a la apreciación de la prueba testifical que realizó el TPI, puesto que los foros apelativos solo tienen ante sí las transcripciones de aquellos testimonios, y es imposible que nosotros podamos verdaderamente apreciar el *demeanor* de los testigos y auscultar su credibilidad. La determinación de credibilidad depende de observar la manera en que la persona testigo declara, apreciar sus gestos, titubeos, contradicciones, entre otros factores que van formando gradualmente la convicción en cuanto a la verdad en la conciencia de la persona juzgadora. *Suárez Cáceres v. Com. Estatal Elecciones, supra*, págs. 67-68. El criterio de la credibilidad es aún más pertinente cuando en los casos de discrimen al amparo de la Ley Núm. 100, en donde "es inevitable la necesidad de establecer la intención del patrono, por lo que **el factor**

**[de] credibilidad desempeña un papel importantísimo en el resultado de la reclamación**". C. Zeno Santiago & V.M. Bermúdez Pérez, *op. cit.*, pág. 344. (Énfasis nuestro).

Tras un análisis holístico de la prueba presentada, incluyendo las transcripciones de los testimonios de las Demandantes, del Sr. Pérez y de los otros testigos, es forzoso concluir que no se cometieron los errores relacionados con la apreciación de la prueba y, en efecto, el TPI actuó correctamente al concluir que las Demandantes habían sufrido de discrimen por sexo, origen nacional y edad, y padecido represalias por radicar querellas ante el Departamento del Trabajo. Así, quedaron probadas sus causas de acción al amparo de la Ley Núm. 100, *supra*, y 115, *supra*. Veamos.

Es crucial para toda persona que presente una causa de acción al amparo de la Ley Núm. 100 establecer un caso *prima facie* de discrimen. En el caso de discrimen por sexo y por origen nacional, debe demostrar: (1) que hubo un despido o acción perjudicial; (2) que se realizó sin justa causa; y, (3) presentar evidencia indicativa de la modalidad de discrimen que se vincula a su despido. Establecido un caso *prima facie*, es el deber de la parte demandada rebatir la presunción. Por otro lado, hemos adelantado que el despido al que hace alusión la Ley Núm. 100 y Ley Núm. 80, *supra*, no es meramente aquel realizado directamente por un patrono a su empleado. Este también contempla aquella renuncia que presenta el empleado luego de que el patrono haya intentado influenciarlo a renunciar o le ha impuesto condiciones de trabajo más onerosas, reducido el salario, rebajado en categoría o sometido a vejámenes o humillaciones de hecho o de palabra.

Las señoras Araya, Domínguez y Rubiera testificaron que las condiciones de trabajo y el ambiente laboral fomentado y permitido por el Sr. Pérez las dejaron sin otra opción que no fuese renunciar. En este sentido, no tenemos duda en que se configuró un despido

constructivo. Ante las condiciones y humillaciones constantes que sufrieron las Demandantes, una persona razonable hubiese renunciado. La conducta considerada probada arremete en contra de la dignidad del ser humano. Nuestro ordenamiento jurídico protege la dignidad del ser humano e impone penalidades en contra quien la violente. Por otro lado, también fueron víctimas de humillaciones públicas ante otros empleados y la clientela del restaurante. Hubo circunstancias en las cuales el Sr. Pérez se expresó despectivamente hacia los dominicanos, haciendo declaraciones como que "las mujeres dominicanas solamente servían para trabajar y abrir las patas".[63] Tampoco existe duda de que el Sr. Pérez presentó un patrón de discrimen por sexo, mediante sus comentarios y conducta dirigidas a sus empleadas. La misma conducta no la utilizaba en contra de los empleados. Durante su testimonio, el Sr. Pérez no logró refutar estas alegaciones, sino se amparó en defensas estereotipadas y generalizadas, alegando que lo testificado no ocurrió. Al TPI no le mereció credibilidad el testimonio del Sr. Pérez y sí le mereció entera credibilidad el testimonio de las Demandantes.

Con relación a la Sra. Rubiera, esta fue víctima de conducta constitutiva de hostigamiento sexual. Surge de su testimonio que el Sr. Pérez la llamaba "*jas mog*" o "*hasmot*", haciendo alusión a sus características físicas con índole sexual. Además, la llamaba en la noche, le hacía invitaciones con connotaciones sexuales como ir a una playa en donde podrían bañarse desnudos y enviarle videos por WhatsApp con contenido sexual. Debido a la realidad de que el Sr. Pérez era supervisor de la Sra. Rubiera, estas acciones produjeron un ambiente laboral hostil, que provocaron que ella tuviese que renunciar.

---

[63] Transcripción de 19 de octubre de 2022, *supra,* pág. 156.

Además de haber sufrido discrímenes por sexo y nacionalidad, las señoras Domínguez y Araya fueron víctimas de discrimen por edad. Con frecuencia, el Sr. Pérez les hizo comentarios sobre su edad y que ellas debían retirarse. Contrató empleados nuevos y más jóvenes y le comenzó a modificar los turnos y horarios de trabajo. La prueba ventilada y los testimonios de las partes demostraron que las señoras Domínguez y Araya fueron discriminadas por razón de sus edades.

Establecido un caso *prima facie* de discrimen por parte de las Demandantes, el Sr. Pérez no presentó prueba adecuada para rebatirlo. En consecuencia, no se cometieron los primeros ocho errores señalados.

Ahora bien, debemos discutir los errores 9 y 10, respectivamente, relacionados con la concesión de remedios al amparo de las leyes antes citadas. Por esta razón, estaremos atendiéndolos en conjunto.

Antes de comenzar, debemos resaltar algunas normas relevantes al cómputo de daños en los casos de discrimen laboral. Primero, cuando existen varias causas de acción al amparo de diversas leyes laborales, incluyendo la Ley Núm. 100, el remedio apropiado es el más favorable para el empleado discriminado. En este caso, el remedio más favorable es aquel que provee el Artículo 1 de la Ley Núm. 100, puesto que este es uno holístico y abarcador. En segundo lugar, no procede que se conceda más de un remedio por los mismos hechos, por lo que cuando tiene derecho a la mesada esta debe ser descontada del remedio concedido al amparo de la Ley Núm. 100, luego de aplicar la doble penalidad. Tercero, debemos destacar que la Reforma Laboral de 2017 impone una cuantía máxima de $50,000.00 para las angustias mentales concedidas cuando el patrono emplea menos de 101 personas. Cuarto, el remedio de la Ley Núm. 100 contempla tanto los daños causados en

concepto de salarios dejados de devengar, como los daños causados en virtud de la pérdida de ingresos futuros. Quinto, los tribunales debemos tomar en consideración varios factores al momento de determinar la pérdida de ingresos futuros, puesto que esto es un ejercicio en el que existe un grado de especulación. Por otro lado, en los casos de discrimen por edad, la parte demandante tendrá derecho a ser compensada por la pérdida de ingresos futuros hasta tanto cumpla la edad de retiro (65 años). Cuando esta persona fue despedida luego de haber cumplido los 65 años, el tribunal deberá determinar la edad hasta la cual hubiese podido ejercer sus funciones. Sexto, la concesión de daños no puede estar basada en meras generalidades, sino el tribunal debe conceder las compensaciones según la prueba ventilada y creída. Séptimo, cuando un demandante ha conseguido empleo luego de su renuncia y antes de que se dicte la sentencia, procede descontar sus ingresos devengados en el nuevo empleo antes de aplicar la doble penalidad de la Ley Núm. 100. Finalmente, los foros apelativos únicamente interferirán con la concesión de daños que realizó el tribunal de instancia salvo que sean exageradamente altos o ridículamente bajos, o no estén fundamentados por la prueba presentada.

Considerando la normativa de imposición de daños, revisamos las partidas concedidas, comenzando con las angustias mentales. En su *Sentencia*, el TPI concedió $35,000.00 en daños por angustias mentales para cada Demandante antes de aplicar la doble penalización de la Ley Núm. 100. Luego de la doble penalidad, la compensación por angustias mentales resultó en $70,000.00 por Demandante. Tras un análisis de la prueba ventilada, y los hechos estimados probados por el TPI, consideramos que la partida de $35,000.00, concedida en concepto de angustias mentales, está justificada por la prueba. Las Demandantes testificaron sobre los abusos que sufrieron durante su empleo en La Boulangerie, y que

estos fueron causados únicamente por la conducta del Sr. Pérez hacia ellas. Las humillaciones diarias, verbales y físicas, en conjunto con las preocupaciones sobre sus futuros, tras tener que renunciar sin tener un empleo garantizado justifican sin lugar a dudas la concesión por angustias mentales. No obstante, la concesión por parte del TPI excedió lo que la Reforma Laboral de 2017, *supra*, impone como un límite máximo. Esta no puede exceder $50,000.00 por demandante, luego de aplicar la doble penalidad. En consecuencia, procedemos a reducir las cuantías concedidas de $70,000.00 a $50,000.00 por Demandante, conforme el límite que dispone el Artículo 6.1 de la Reforma Laboral de 2017.

La revisión de las compensaciones por salarios dejados de devengar, pérdida de ingresos futuros y el cálculo de la mesada, estaremos atendiéndolo individualmente por cada Demandante.

### a. Sra. Cristina Domínguez

En su *Sentencia*, el TPI estimó probado que la Sra. Domínguez llegó a devengar $3.70 por hora más $500.00 en concepto de propinas bisemanalmente. Trabajaba los domingos, martes, miércoles, jueves y sábados, con horario de 6:30 am a 3:00 pm.[64] Por lo tanto, trabajó un promedio de 8.5 horas, cinco (5) días a la semana. Según el Exhibit VII, la Sra. Domínguez renunció el 20 de septiembre de 2019[65] y la *Sentencia* fue dictada el 16 de febrero de 2024, cuatro (4) años y cinco (5) meses después. En consecuencia, no es irrazonable, la cuantía de $79,907.55 que determinó el TPI como compensación por salarios dejados de devengar.

El TPI concluyó, que la Sra. Domínguez fue víctima de discrimen por edad, por lo que procede una indemnización por pérdida de ingresos futuros hasta los sesenta y cinco (65) años. Al momento de su renuncia, la Sra. Domínguez tenía 56 años. Por

---

[64] Apéndice, *supra*, pág. 684.
[65] *Íd.*, pág. 346.

ende, la cuantía determinada por el TPI de $127,478.52 en concepto de pérdida por ingresos futuros no es exageradamente alta ni ridículamente baja.

Ahora bien, la Sra. Domínguez testificó que en el tiempo entre su renuncia y dictarse la *Sentencia*, ella trabajó unos meses como trabajadora doméstica, y eventualmente, consiguió empleo en el Restaurante Café San Telmo en Isla Verde. No obstante, no se pasó prueba sobre el salario que devengó en aquellos empleos, que según la normativa expuesta en *Ramírez Ferrer v. Conagra Foods PR*, *supra*, y *Torres Rivera v. Econo Rial, Inc.*, *supra*, deben ser descontados antes de aplicar la doble penalidad.

En resumen, con relación a la compensación de la Sra. Cristina Domínguez, al haberse configurado un despido injustificado y discrimen por sexo y nacionalidad, confirmamos la partida concedida en concepto de salarios dejados de devengar. Al haber conseguido un empleo nuevo, no procede la compensación por pérdida de ingresos futuros. Por no haberse pasado prueba sobre los salarios devengados en su nuevo empleo, devolvemos el caso al TPI para que se pase prueba sobre los ingresos devengados por la Sra. Domínguez entre su renuncia y la *Sentencia*, con el propósito de que se descuenten de su compensación conforme lo resuelto en *Torres Rivera v. Econo Rial, Inc.*, *supra*.

### b. Sra. María Araya

El TPI estimó probado que la Sra. Araya llegó a devengar un salario de $3.70 por hora y aproximadamente $800.00 bisemanalmente en concepto de propinas. Trabajaba los domingos, martes, jueves, viernes y sábados.[66] Además, trabajó un promedio de 46 horas por semana.[67] La Sra. Araya renunció de su empleo en

---

[66] Apéndice, *supra*, pág. 687.
[67] *Íd.*, pág. 278.

La Boulangerie el 20 de septiembre de 2019,[68] a sus 69 años y luego de haber trabajado en el restaurante desde mayo de 2002.[69]

Estimado probado que la Sra. Arya fue víctima de un despido injustificado y de discrimen por razón de sexo y nacionalidad, confirmamos las cuantías concedidas en concepto de salarios dejados de devengar. Al haber también sido discriminada por razón de edad, y no haber conseguido empleo posterior, confirmamos la compensación por pérdida de ingresos futuros. En cuanto a la mesada descontada, el TPI la calculó en $47,020.02. Tampoco vemos que el TPI haya errado en el cálculo de ésta, por lo que procedemos confirmarla.

No se desprende de la prueba que la Sra. Araya haya trabajado luego de renunciar a su empleo en La Boulangerie, por lo que no procede un descuento en el cómputo realizado por el TPI. A su vez, debido a la naturaleza del trabajo que realizaba la Sra. Araya en La Boulangerie, consideramos razonable que el TPI haya concluido que pudo haber trabajado hasta los setenta y cinco (75) años. La única modificación que procede es la reducción de la partida por angustias mentales a $50,000.00, luego de aplicar la doble penalidad, para conformarla con el límite dispuesto por la Reforma Laboral de 2017, *supra.*

### c. Sra. Ana Rubiera

El TPI estimó probado que la Sra. Rubiera devengaba un salario de $3.70 por hora más propinas.[70] Según testificó la Sra. Rubiera, su horario en La Boulangerie era de 9:00 am a 3:00 pm los lunes y miércoles, y de 8:00 am a 2:30 pm los sábados y domingos, aproximadamente veinticinco (25) horas por semana.[71] Finalmente, fue empleada del 26 de noviembre de 2014 hasta el 26 de octubre

---

[68] *Íd.*, pág. 346.
[69] *Íd.*
[70] *Íd.*, pág. 689.
[71] Transcripción de la vista celebrada el 19 de octubre de 2022, *supra*, pág. 140.

de 2018, cuando renunció.[72] Luego de renunciar, testificó que consiguió empleo como mesera en un restaurante llamado "Sabor D'Aquí".[73]

No obstante, no surge de la prueba presentada cuánto devengaba la Sra. Rubiera en concepto de propinas en La Boulangerie, ni cuánto genera como salario en su empleo actual. La *Sentencia* del TPI tampoco incluye esta información, lo que hace imposible auscultar como llegó a la compensación por daños concedida. Como ha resuelto anteriormente el Tribunal Supremo:

> Este menester de los Jueces [la fijación de daños] debe estar presidido por un sano juicio y por criterios razonables y ponderados en la evaluación de cada caso, con objetividad de la realidad probada, de modo que siempre se conserve el sentido remediador del resarcimiento, que impone el Art. 1802 [del Código Civil de 1930] y el accidente no sea motivo de especulación o ganancia.
>
> *Vda. de Valentín v. E.L.A.*, 84 DPR 112, 123 (1961).

La concesión de daños, no sustentados en prueba admitida y creída por el tribunal sentenciador, constituye un ejercicio especulativo, que posiblemente raye en lo arbitrario.

Ante esto, no es posible ejercer nuestro rol revisor con relación a la compensación de daños en concepto de salarios dejados de devengar y pérdida de ingresos futuros en el caso de la Sra. Rubiera. Sin saber la cantidad que devengaba la Sra. Rubiera en concepto de propinas, tampoco podemos calcular su mesada para así descontarla del cómputo de compensación al amparo de la Ley Núm. 100, *supra*. Finalmente, al no conocer cuánto devengó en su empleo actual, no podemos hacer el cómputo para deducirlo conforme la jurisprudencia antes citada del Tribunal Supremo. En consecuencia, revocamos las cuantías por salarios dejados de devengar, la pérdida de ingresos futuros y la mesada.

---

[72] Apéndice, *supra*, pág. 346.
[73] Transcripción de la vista celebrada el 19 de octubre de 2022, *supra*, pág. 164.

Ahora bien, como hemos discutido, la Sra. Rubiera sí fue discriminada por razón de sexo por su patrono cuando trabajaba en La Boulangerie y fue despedida injustificadamente. Además, fue la víctima de hostigamiento sexual por parte del Sr. Pérez, por lo que tiene derecho a una compensación. Sería un fracaso de la justicia dejarla sin remedio o compensación por los daños que claramente sufrió. Por lo tanto, procede una compensación por angustias mentales reducida a $50,000.00, en cumplimiento con el tope establecido por la Reforma Laboral de 2017, *supra*. Además, ordenamos la devolución del caso al TPI para que se pase prueba sobre las propinas que devengó la Sra. Rubiera en La Boulangerie y el salario que devengó durante su empleo posterior a su renuncia.

Por otro lado, por no haberse determinado que la Sra. Rubiera sufrió algún discrimen por edad, no procede la compensación de salarios dejados de devengar hasta los sesenta y cinco (65) años, por lo que revocamos dicha partida.

Como último error señalado, el Sr. Pérez alegó que el TPI erró al imponerle responsabilidad individual por los actos de discrimen.

En primer lugar, los actos culposos aquí alegados y probados fueron perpetrados por el Sr. Pérez. En el caso del discrimen por hostigamiento sexual, el Tribunal Supremo de Puerto Rico ha resuelto explícitamente que "un agente, oficial, administrador o supervisor de una empresa responde civilmente en su carácter personal, a los fines de las Leyes Núm. 17, 69 y 100, **en adición al patrono real**, por los actos de hostigamiento sexual cometidos por él en contra de un obrero o empleado de dicho patrono". *Rosario v. Dist. Kikuet, Inc.*, 151 DPR 634, 648 (2000). (Énfasis nuestro). La Ley Núm. 17 establece una causa de acción en contra de **toda persona** que sea encontrada culpable constituyente en hostigamiento sexual.

Por otro lado, la Ley Núm. 100, *supra,* únicamente provee una causa de acción en contra de todo "patrono" que discrimine o tome represalias en contra de un empleado. Define "patrono" como "toda persona natural o jurídica que emplee obreros, trabajadores o empleados, y al jefe, funcionario, gerente, oficial, gestor, administrador, superintendente, capataz, mayordomo, agente o representante de dicha persona natural o jurídica. Incluirá aquellas agencias o instrumentalidades del Gobierno de Puerto Rico que operen como negocios o empresas privadas". Artículo 6 (2), *Íd.*

En el caso de autos, el patrono de las Demandantes no es el Sr. Pérez, sino Tradition Francaise, Inc., una corporación doméstica, con fines de lucro, incorporada en Puerto Rico. Su presidente, accionista principal y agente residente es el Sr. Pérez. Es sabido que una corporación goza de su propia personalidad jurídica e individualizada. Por lo tanto, el Sr. Pérez no responde en su carácter personal y de forma individual por ser el presidente y accionista de Tradition. No obstante, el Sr. Pérez y Tradition son dos personas con capacidades individuales e independientes. En este sentido, el Sr. Pérez debe responder por sus propias acciones, incluyendo aquellas que causen daños al amparo del Artículo 1802 del Código Civil de 1930, *supra.* El Sr. Pérez no puede protegerse de su responsabilidad por ser un funcionario corporativo de Tradition. "Los funcionarios corporativos, como cualquier otra persona en nuestro ordenamiento jurídico, son responsables por los daños y lesiones que ocasionen a terceros como resultado de su culpa y negligencia". C.E. Díaz Olivo, *Corporaciones: tratado sobre derecho corporativo,* 2ª ed. rev., Colombia, Ed. AlmaForte, 2022, pág. 198.

El Artículo 1802 del Código Civil de 1930 dispone que toda persona que ocasione un daño viene obligada a repararlo. Dicho estatuto es uno abarcador en lo concerniente al daño. Para que un demandante prospere en una causa de acción al amparo del Artículo

1802, este debe probar que hubo un daño real que estuvo causado por una acción culposa o negligente. En el caso de autos, esta causa de acción quedó claramente probada. El Sr. Pérez, en su carácter personal, realizó actos discriminatorios en contra de las Demandantes. Dichos actos, descritos anteriormente, le causaron daños económicos y emocionales a las Demandantes, incluyendo que se vieran obligadas a renunciar de sus empleos. El nexo entre la conducta del Sr. Pérez y los daños sufridos por las señoras Domínguez, Araya y Rubiera es claro y patente. Por lo tanto, la responsabilidad del Sr. Pérez por los daños ocasionados, en su carácter personal, no surge en virtud de su posición como presidente de Tradition, sino en virtud de ser quien realizó los actos culposos. Por lo tanto, no se cometió el error señalado.

En resumen, confirmamos al TPI en cuanto a sus determinaciones sobre discrimen por edad, nacionalidad y sexo, como hostigamiento sexual. En cuanto a las partidas de daños concedidas a las señoras Domínguez y Araya, las confirmamos por no considerarlas exageradamente altas ni ridículamente bajas. Procedemos a reducir las partidas concedidas a las tres Demandantes por concepto de angustias mentales a $50,000.00 por cada una, conforme lo dispuesto en la Reforma Laboral de 2017, *supra*. Por no estar sustentada por la prueba, revocamos las partidas concedidas a la Sra. Rubiera. En consecuencia, devolvemos el caso al TPI para que las partes pasen prueba sobre los salarios devengados por las señoras Domínguez y Rubiera en sus empleos posteriores a sus renuncias en La Boulangerie y antes de dictarse la *Sentencia*. Además, las partes deben pasar prueba sobre el salario que devengó la Sra. Rubiera durante su empleo en La Boulangerie. Ventilada aquella prueba, el TPI deberá calcular la compensación en daños conforme lo aquí resuelto. Finalmente, resolvemos que el Sr. Pérez responde en su carácter individual al amparo del Artículo

1802 por haber sido responsable por los daños ocasionados a las Demandantes.

**IV.**

Por los fundamentos antes discutidos, modificamos la *Sentencia* recurrida. Devolvemos el caso al TPI para que realicen los procedimientos conforme lo que aquí hemos ordenado.

Lo acordó y manda el Tribunal y lo certifica la Secretaria.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones